FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2019 MAR 20 PM 12: 20

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff*, | ) | |
| v. | ) | CAUSE NO. |
| KERRI AGEE (a/k/a KERRI AGEE-SMITH), KELLY ISLEY, NICOLE SMITH (a/k/a NICOLE SMITH-KELSO), CHAD GRIFFIN, and MATTHEW SMITH, | ) | 1:19-cr-0103 JPH-DLP |
| *Defendants*. | ) | |

**INDICTMENT**

The Grand Jury charges that:

**Introductory Allegations**

At all times relevant to this Indictment:

1. Banc-Serv Partners LLP ("Banc-Serv") was a lending service provider ("LSP") headquartered first in Indianapolis, Indiana and later in Westfield, Indiana. The company's legal name was ADR Partners, LLC. Most of Banc-Serv's clients were small federally insured lending institutions located in the Midwest. As an LSP, Banc-Serv packaged, originated, disbursed, serviced, and liquidated loans guaranteed by the Small Business Administration ("SBA") on behalf their lending institution clients.

2. Defendant **KERRI AGEE** (a/k/a KERRI AGEE-SMITH), a resident of Hamilton County, was the founder, president, and chief executive officer of Banc-Serv.

3. Defendant **KELLY ISLEY**, a resident of Hamilton County, was the chief operating officer of Banc-Serv.

4. Defendant **NICOLE SMITH** (a/k/a NICOLE SMITH-KELSO), a resident of Marion County, was employed as a relationship manager at Banc-Serv.

5. Defendant **CHAD GRIFFIN**, a resident of Hamilton County, was a relationship manager at Banc-Serv, and later the chief marketing officer.

6. Defendant **MATTHEW SMITH**, a resident of Hamilton County, was a managing director of Lending Institution #1, an Illinois-based non-bank SBA lending institution that worked with Banc-Serv to originate SBA loans, and had previously co-founded Banc-Serv with **KERRI AGEE** but left in or around 2005.

7. Co-conspirator Paul Kibiger was employed as a special assets manager at Banc-Serv.

8. Co-conspirator Kelly Ayers was employed in commercial lending positions at Lending Institution #2, an Indiana-based federally insured financial institution as defined by 18 U.S.C. § 20 and 18 U.S.C. § 3293(2).

**<u>The SBA Lending Program</u>**

9. The SBA was a government agency that ran a program through which, according to certain guidelines, it provided guarantees to loans made by lenders to small businesses. An SBA guarantee ranged from 50% to 90%. This meant that the SBA would purchase from 50% to 90% of the balance of the guaranteed loan from the note's holder in the event the borrower defaulted.

10. The most common guarantee provided by the SBA was through the 7(a) guarantee program, which was SBA's general loan program. To request a 7(a) guarantee, the lender and borrower had to fill out various applications and forms providing details about the borrower's financial condition and the proposed use of loan proceeds. One of the forms that had to be filled out was an eligibility questionnaire, which contained a checklist of requirements for a loan to be guaranteed by the SBA. Those requirements included, among others: (1) that proceeds not be used to pay past-due withholding taxes, and (2) that proceeds not be used to make distributions to, or pay a debt owed to, an affiliate of the borrower. If either of the boxes were checked, the loan would be ineligible for a guarantee. At the end of the form, the lender certified the information provided was true and correct.

11. An important document in the guarantee process was the loan authorization, which was the document that listed the various conditions under which the SBA would provide the guarantee. The SBA would issue a loan authorization after the required forms and applications had been submitted. As part of the authorization, the lender had to agree that it would maintain evidence that loan proceeds were used only for eligible purposes in the approximate amounts listed on the loan authorization. Such evidence included a settlement statement, signed at the loan's closing by the lender and borrower, showing how loan proceeds were disbursed. If a lender did not intend to follow the terms and conditions of the authorization, the loan could not be originated.

12. In the event a loan defaulted, the lender would have to submit the loan authorization and settlement statement, among other documents, to the SBA as part of a request that the SBA honor the guarantee and purchase the balance on the defaulted loan. By submitting these documents as part of the purchase request, the lender was representing to the SBA, among other

things, that it had complied with the terms of the loan authorization. The lender would also have to certify that the lender had "materially complied with the SBA Loan Program Requirements (as defined in 13 CFR 120.10) applicable to this loan." If SBA rules were not followed, the SBA could deny the guarantee, resulting in losses to the lending institution.

13. The SBA had a lending arrangement with certain banks called the Preferred Lenders Program ("PLP"), under which participating banks were authorized to issue SBA guarantees for new loans on behalf of the SBA so long as they followed all the relevant SBA guidelines. In such circumstances, and unlike with the standard 7(a) guarantees, SBA conducted little to no review of the loan or the accompanying paperwork before the loan authorization was issued. There were several SBA loan programs which operated under PLP, including SBA Express, which was designed for smaller loans (typically, those $350,000 or less), and the Patriot Express Pilot Loan Initiative ("Patriot Express"), which provided loans to business owners who were veterans of the armed services. However, one of the requirements of a PLP-originated loan was that the guarantee could not have been sought previously via a different SBA program without explicit approval by an SBA official. The lending institution had to certify to that fact on an eligibility questionnaire.

14. The bank originating an SBA-guaranteed loan through SBA Express or Patriot Express was required to maintain the documents, applications, and questionnaires from the origination process and submit them at the time the bank actually requested that the SBA purchase the balance on a defaulted loan. By submitting these documents as part of the purchase request, the lender was representing to the SBA, among other things, that it had complied with the terms of the SBA Express loan authorization. When a purchase request was made for a SBA Express

or Patriot Express loan, the lender had to certify under penalty of perjury that it "used appropriate diligence to ensure that disbursements were used exclusively for business related purposes."

15. Lenders, or their agents, could request loan authorizations through the SBA Express or Patriot Express via an online portal called E-Tran. Once the requests were received, the SBA issue the authorization and assign a loan number, which allowed the loans to close and the proceeds to be disbursed.

16. Lenders had the option of hiring a Lender Service Provider ("LSP") to package, originate, disburse, service, or liquidate SBA loans on the lenders' behalf, including the use of PLP. In carrying out any of these tasks, the LSP would act as the lender's agent and frequently correspond directly with the SBA, submit authorization requests to the SBA through E-Tran, and submit the loan-purchase requests to the SBA on behalf of the lenders. As an LSP, Banc-Serv interacted directly with the SBA on behalf of its clients at all stages of packaging, originating, servicing, and liquidating SBA loans.

**Other Related Entities**

17. Loan Officer #1 was employed in commercial lending positions at Lending Institution #3, an Iowa-based federally insured financial institution as defined by 18 U.S.C. § 20 and 18 U.S.C. § 3293(2).

18. Loan Officer #2 was employed in commercial lending positions at Lending Institution #3.

19. Borrower #1 was an Indiana-based business that in or around December 2004 obtained a $1,400,000 SBA-guaranteed loan from Lending Institution #4, an Indiana-based federally insured financial institution as defined by 18 U.S.C. § 20 and 18 U.S.C. § 3293(2).

20. Borrower #2 was an Iowa-based business that in or around October 2007 obtained a $350,000 SBA-guaranteed loan from Lending Institution #3.

21. Borrower #3 was an Iowa-based business that in or around November 2007 obtained a $2,000,000 SBA-guaranteed loan from Lending Institution #3.

22. Borrower #4 was an Iowa-based business that in or around January 2008 obtained a $225,000 SBA-guaranteed loan from Lending Institution #3, which obtained the guarantee through SBA Express.

23. Borrower #5 was a Nebraska-based business that in or around June 2008 obtained a $1,200,000 SBA-guaranteed loan from Lending Institution #1.

24. Borrower #6 was an Iowa-based business that in or around April 2009 obtained a $35,000 SBA-guaranteed loan from Lending Institution #3, which obtained the guarantee through SBA Express.

25. Borrower #7 was an Indiana-based business that in or about April 2010 obtained a $350,000 SBA-guaranteed loan from Lending Institution #2, which obtained the guarantee through Patriot Express.

**The Fraudulent Scheme**

Overview of the Scheme

26. The Defendants, co-conspirators, other Banc-Serv employees, and lending officers at other banks or lending institutions, would seek to obtain SBA guarantees for loans that did not meet SBA's guidelines and requirements. To ensure the loans would appear to meet SBA lending guidelines, the Defendants and co-conspirators would make false statements on loan-guarantee applications and purchase requests sent to the SBA about matters such as a borrower's eligibility

to receive a loan and how loan proceeds would be disbursed. Specifically, but not exclusively, the Defendants and their co-conspirators worked to obtain SBA-guaranteed financing for ineligible expenses and uses of money—such as past-due payroll taxes and personal debt—by falsely designating the loan proceeds going to those ineligible expenses and uses as "working capital," which were funds for a business's normal operating expenses. Additionally, the Defendants and their co-conspirators abused PLP authority by submitting applications for loans and borrowers that the SBA had previously deemed to be ineligible. The Defendants knew these practices were against SBA guidelines. When the loans defaulted, the Defendants and co-conspirators would submit the same misrepresentations in the loan applications, authorizations, settlement statements, and questionnaires as part of purchase requests to the SBA to ensure that the banks originating the SBA-guaranteed loans, or the secondary-market investors that had purchased the guaranteed portions of the loans, would be compensated. As a result, the SBA incurred losses by purchasing loans that, had it known of the misrepresentations made in the loan files by the co-conspirators, it never would have guaranteed in the first place.

27. Over the course of, and in furtherance of, the fraudulent scheme, which began no later than November 2004 and ended on or about October 12, 2017, the Defendants and their co-conspirators originated dozens of loans, totaling over $10 million in disbursements, which were not eligible for SBA guarantees.

Purpose of the Scheme

28. The purpose of the scheme was for the Defendants and co-conspirators (a) to generate additional unlawful revenue for Banc-Serv—and ultimately compensation for themselves—in the form of packaging fees, servicing fees, and fees for selling the guaranteed

portions of the loans to investors, and (b) to conceal the ineligible loans from the SBA so Banc-Serv would not have to indemnify the lending institutions, the secondary-market investors, or the SBA for having originated and sold ineligible loans that ultimately defaulted.

***Loan to Borrower #1***

29. As set forth below, **KERRI AGEE** and **MATTHEW SMITH** originated an SBA-guaranteed loan in which they instructed the borrower to take $50,000 of loan proceeds designated as working capital to make it appear that the borrower had made a $50,000 equity injection when the borrower had not in fact done so.

30. In or around November 2004, **KERRI AGEE** prepared an SBA 7(a) loan application on behalf of Lending Institution #4 for a $1,400,000 loan made in the name of Borrower #1. The loan proceeds were going to be used to finance the purchase of the business by the new owners.

31. On or about December 2, 2004, the SBA issued a loan authorization for Lending Institution #4 to make a $1,400,000 guaranteed loan to Borrower #1. The authorization allowed $65,004.20 to be used for working capital. The authorization also required the lender to "obtain evidence that prior to disbursement . . . [a]t least $50,000.00 cash has been injected into the business as equity capital."

32. **KERRI AGEE**, as Lending Institution #4's agent, had no intention of following the terms and conditions of the authorization when she caused the loan to be funded. On or about December 17, 2004, one of the new owners of Borrower #1 negotiated a check numbered 3663 in the amount of $50,000 with the memo line "Equity Injection." **KERRI AGEE** and **MATTHEW SMITH** were aware that the new owner did not have the funds in his account to support that check.

Immediately prior to negotiating that check, **KERRI AGEE** and **MATTHEW SMITH** told the new owner of Borrower #1 to bring that check to the closing of the SBA loan in or around December 17, 2014. They told him that the $50,000 that was supposed to be the equity injection would be paid from the loan proceeds labeled working capital.

33. On or about December 17, 2004, **KERRI AGEE** and **KELLY ISLEY** created a settlement statement for Borrower #1 falsely listing that $65,004.20 of loan proceeds would be used for working capital. They prepared the settlement statement knowing that, in the event Borrower #1 defaulted, it would be sent to the SBA in support of a request that SBA honor the loan guarantee.

34. On or about December 20, 2004, after the SBA loan had been settled, Borrower #1 received a check drawn on Lending Institution #4 for $50,000 to balance out the $50,000 in the equity injection check. These funds were proceeds of the SBA loan that closed on that day.

35. On or about September 3, 2009, after Borrower #1 had defaulted on its SBA-guaranteed loan, a Banc-Serv employee electronically transmitted to the SBA the loan authorization and the false settlement statement that had been prepared by **KERRI AGEE** and **KELLY ISLEY** and signed at closing in support of a request that the SBA purchase the outstanding balance on the loan that Lending Institution #4 had made to Borrower #1. The purchase request also contained a false certification by an employee at Lending Institution #4 that Lending Institution #4 "has materially complied with the SBA Loan Program Requirements (as defined in 13 CFR 120.10) applicable to this loan." The SBA did purchase the outstanding balance on the Borrower #1 loan.

***Loan to Borrower #2***

36. As set forth below, **KERRI AGEE**, **KELLY ISLEY**, and **NICOLE SMITH** originated an SBA loan in which they lied to the SBA about the borrower's size, resubmitted the denied loan under a fabricated name to avoid further SBA scrutiny, and refinanced ineligible debt by falsely designating loan proceeds as working capital.

37. On or about October 5, 2007, **NICOLE SMITH** sent to the SBA an SBA 7(a) loan application that she had prepared on behalf of Lending Institution #3 for a $350,000 loan to be made to Borrower #2. The application proposed that $150,000 of the SBA loan proceeds would be used to repay a personal loan that Borrower #2's owner had made to Borrower #2.

38. On or about October 15, 2007, the SBA faxed a letter denying the loan application for Borrower #2, stating that the loan proceeds could not be used to pay ineligible affiliate debt (i.e., the owner's loan to Borrower #2) and that Borrower #2 was too large to qualify for an SBA loan. On or about the same day, **NICOLE SMITH** forwarded the denial letter to **KELLY ISLEY** and **KERRI AGEE**, asking, "[c]an we go over this Tuesday morning?"

39. On or about October 18, 2007, in an attempt to make Borrower #2 appear to be small enough to qualify for the SBA loan, **KELLY ISLEY** spoke with an SBA official and falsely told the official that Borrower #2's affiliate had already closed when in fact it had not yet done so.

40. On or about October 23, 2007, the SBA official responded to **KELLY ISLEY**'s inquiry, "Based on the information that the affiliate ceased operations in the 1st quarter of 2007 and no longer exists, it would appear that we do not need to count the affiliate for SIZE." **KELLY ISLEY** forwarded the response to **NICOLE SMITH**, while copying **KERRI AGEE**, and added, "WORK YOUR MAGIC!!!!"

41. On or about October 23, 2007, **KELLY ISLEY** emailed **NICOLE SMITH**, copying **KERRI AGEE**, to tell her that she received a call from an SBA official who had questions about the Borrower #2 loan application. **KELLY ISLEY** told **NICOLE SMITH** to "remember that I told [a different SBA official] opeations ceased in jan. Of this year."[1] **NICOLE SMITH** responded that the SBA "has the package with the interims dated for July 31, 2007 after [**KELLY ISLEY**] told [the SBA] the company shut down in January." Upon receipt of that email, **KELLY ISLEY** emailed **KERRI AGEE** that she "fibbed [to the SBA official] to get this one done," and asked her how they should handle this issue with Loan Officer #1, the Lending Institution #3 official handling the Borrower #2 application.

42. Later that day, **NICOLE SMITH** emailed **KERRI AGEE** and **KELLY ISLEY** to tell them that the SBA was also asking for "a breakdown on use of the $150,000 we moved from paying the affiliate business to working capital, [the SBA] wants to know exactly where it is going." **KELLY ISLEY** responded to both **KERRI AGEE** and **NICOLE SMITH** that they would proceed with only one owner on the SBA application, but that they would "most likely have to withdraw the application then resubmit."

43. On or about October 26, 2007, **KELLY ISLEY**, copying **KERRI AGEE** and **NICOLE SMITH**, told the SBA via email that Banc-Serv and Lending Institution #3 were withdrawing the request for the first loan, "as the borrower has decided to go a different route with the bank as too much time has passed." This was not true, as **KELLY ISLEY**, **KERRI AGEE**, and **NICOLE SMITH** intended to resubmit the loan under a different business name so that the SBA would not connect the previously denied loan with the new loan application.

[1] All typographical errors in quotations have been reproduced as they originally appear.

44. On or about October 29, 2007, **NICOLE SMITH** prepared a second SBA 7(a) loan application for Borrower #2, using a fictitious company name that was slightly changed from Borrower #2's actual company name. **NICOLE SMITH** falsely indicated that $200,000 of the proceeds of the $350,000 SBA-guaranteed loan for Borrower #2 would be used for "working capital," when in fact $150,000 of that amount would actually be used by the proprietors of Borrower #2 to pay the debt of an affiliate, which the SBA had previously cited as a reason to deny the first loan. **NICOLE SMITH** also prepared the settlement statement knowing that, in the event Borrower #2 defaulted, it would be sent to the SBA in support of a request that SBA honor the loan guarantee.

45. On or about October 29, 2007, **NICOLE SMITH**, **KERRI AGEE**, and **KELLY ISLEY**, working on behalf of Lending Institution #3, caused the settlement statement and loan application containing the misrepresentations about the use of proceeds, the company name, and the size of the company, to be transmitted via email to the SBA.

46. After the SBA had authorized the guarantee for the new loan, the loan was funded. On or about November 15, 2007, **NICOLE SMITH**, on behalf of Loan Officer #1, submitted an amendment to the SBA switching the name of the new loan back to the actual name of Borrower #2. The SBA official who granted this request was not the same official who denied the initial loan, and was unaware of the earlier-denied application.

47. On or about August 19, 2012, **KERRI AGEE** and **KELLY ISLEY**, working on behalf of Lending Institution #3, caused the settlement statement and loan authorization in the name of Borrower #2, containing misrepresentations about use of proceeds and the size of the borrowing company at the time the authorization had been sought, to be electronically transmitted

to the SBA in support of a request that the SBA purchase the outstanding balance on the loan to Borrower #2. The SBA did purchase the outstanding balance on the Borrower #2 loan.

***Loan to Borrower #3***

48. As set forth below, **KERRI AGEE**, **KELLY ISLEY**, and **NICOLE SMITH** originated an SBA-guaranteed loan in which they concealed from the SBA the involvement of an owner of the borrowing business by resubmitting the denied loan under a fabricated business name and removing that owner from the loan when the ownership had not in fact changed.

49. On or about October 11, 2007, **NICOLE SMITH** prepared an SBA 7(a) loan application on behalf of Lending Institution #3 for a $2,000,000 loan made in the name of Borrower #3, a company that had two 50 percent owners—Owner #1, who was listed as the "CEO" of Borrower #3, and Owner #2, listed as the "President." On or about October 16, 2007, the SBA denied the loan application by Borrower #3, stating that Owner #2 had previously defaulted on an SBA loan, had an outstanding civil judgment against him, and had a poor credit history.

50. On or about October 16, 2007, **KERRI AGEE** emailed Loan Officer #1, copying **KELLY ISLEY** and **NICOLE SMITH**, telling him that they had to make Owner #2 have no more than a 20 percent stake in the company in order to qualify for the SBA loan.

51. On or about October 17, 2007, **NICOLE SMITH** submitted a reconsideration request for Borrower #3, at **KELLY ISLEY** and **KERRI AGEE**'s direction, and with the borrower's consent, had changed its ownership structure to make Owner #2 a 15 percent minority owner instead of a 50 percent owner. On or about October 17, 2007, however, the SBA once again denied the loan, because the agency considered ownership changes over the previous six months to determine who was the owner of a borrowing company.

52. On or about October 18, 2007, **KELLY ISLEY** spoke with an SBA official about the denial, and then wrote an email to **NICOLE SMITH** and **KERRI AGEE**, "[Owner #2] can not be a key employee at all. . . .i told [SBA official] he would be employed there but not a vital part of the operations." As **KELLY ISLEY, NICOLE SMITH**, and **KERRI AGEE** then knew, Owner #2 still intended to be a vital part of the operations.

53. In response, **NICOLE SMITH**, at **KELLY ISLEY** and **KERRI AGEE**'s direction, prepared a new application for the loan to Borrower #3. To ensure the SBA did not connect the denied loan to the new loan, **NICOLE SMITH** changed Borrower #3's name to be a sole proprietorship in the name of Owner #1, with a fictitious company name that was slightly changed from the original Borrower #3 name. However, the loan application still sought $2,000,000 for the same purposes. On this application, the company was listed as only having one owner—Owner #1. Owner #2's signature was whited out from the signature page.

54. On or about October 24, 2007, **NICOLE SMITH** emailed **KELLY ISLEY** and **KERRI AGEE** and asked whether Owner #1 and Loan Officer #1 should be updated about the plan to withdraw and resubmit under a different name for Borrower #3. **KELLY ISLEY** responded, "I don't think you have to call [Loan Officer #1] . . . . they will not know the difference on it..... :)"

55. On or about October 24, 2007, **NICOLE SMITH** transmitted this second application via email to the SBA, knowing it was under a false name and that it falsely indicated that the company was to be solely owned by Owner #1. Neither Owner #1 nor Owner #2 were told about changing the company's name or removing Owner #2 from the loan entirely. The SBA approved the loan application, and Lending Institution #3 disbursed the requested funds.

56. In emails in or around November 2007 between **KERRI AGEE** and **NICOLE SMITH** regarding questions that were being asked about the change in ownership by an outside contractor evaluating a separate loan that Borrower #3 was attempting to obtain, **KERRI AGEE** instructed **NICOLE SMITH** to falsely claim that Owner #2 was no longer an owner of the company. Specifically, after **NICOLE SMITH** asked **KERRI AGEE** whether she should "tell [the contractor] the SBA would not fund with [Owner #2] because he was in default," **KERRI AGEE** responded that **NICOLE SMITH** should "just tell [the contractor] [Owner #1] financially decided to do it himself with out a partner."

***Loan to Borrower #4***

57. As set forth below, **KERRI AGEE** and **NICOLE SMITH** originated a loan in which they misrepresented that the loan had not been previously submitted to the SBA and refinanced ineligible debt by falsely designating loan proceeds as working capital.

58. In or around December 2007, **NICOLE SMITH** prepared an SBA 7(a) loan application on behalf of Lending Institution #3 for a $300,000 loan made in the name of Borrower #4. The application and accompanying materials proposed using SBA-guaranteed funds to pay back an owner of Borrower #4 for a $100,000 loan made to Borrower #4 by the owner.

59. On or about January 9, 2008, the SBA sent a letter to **NICOLE SMITH**, who had submitted the application on behalf of Loan Officer #2 at Lending Institution #3, denying the application on the grounds that (1) that the proposed loan payment to the affiliate using SBA-guaranteed funds was an ineligible use of proceeds, and (2) that the proposed loan did not have enough collateral to secure it.

60. On or about January 23, 2008, **NICOLE SMITH** emailed **KERRI AGEE** about Loan Officer #2, "asking if we can withdraw the 7a authorization and submit as an Express to relieve the collateral issue on the [personal real estate]." Under SBA policy, submitting a loan through SBA Express was not a permissible way to address a denial by the SBA, and the SBA Express eligibility questionnaire notified the lender of this prohibition.

61. On or about January 23, 2008, **KERRI AGEE** emailed **NICOLE SMITH** to tell her that she had to withdraw the first denied application before she could resubmit under SBA Express. **KERRI AGEE** also told **NICOLE SMITH**, "SBA will have to post to their system and make sure it is completely out of their system so there is no problem!" **NICOLE SMITH** told **KERRI AGEE** she was working on the withdrawal letter and that she would wait for confirmation from SBA before resubmitting.

62. On or about January 23, 2008, the initial application for the loan in the name of Borrower #4 was withdrawn via letter sent in the name of Lending Institution #3 and Loan Officer #2. On or about January 24, 2008, the SBA sent a reply letter back directly to **NICOLE SMITH** confirming that the loan had been withdrawn.

63. On or about January 23, 2008, **NICOLE SMITH** prepared and faxed an SBA Express application for a $225,000 term loan and an SBA Express application for a $50,000 working capital line of credit for Borrower #4. On the guarantee eligibility questionnaire for the term loan, **NICOLE SMITH** intentionally did not mark the box indicating the loan had been sought under a different SBA program, when in truth Borrower #4 was seeking to refinance the same debt listed in the original 7(a) loan application.

64. On or about January 29, 2008, **NICOLE SMITH** emailed the closing statement to Loan Officer #2, while copying **KERRI AGEE**, and stated, "Attached is the closing statement you requested. You will notice that there is not a line to pay off [the owner], however that $100,000 is lumped into Working Capital. [Borrower #4] will have to cut [the owner] a check separately." The $100,000 payment to the owner was what the SBA had previously denied in the 7(a) guarantee request.

***Loan to Borrower #5***

65. As set forth below, **KERRI AGEE**, **CHAD GRIFFIN**, and **MATTHEW SMITH** originated an SBA-guaranteed loan in which they falsely designated loan proceeds as working capital to conceal the impermissible payment of delinquent taxes.

66. On or about April 15, 2008, Lending Institution #1 brought a proposed loan to Borrower #5 to Banc-Serv for assistance in obtaining an SBA guarantee. Borrower #5 had over $700,000 in past-due payroll taxes, and Lending Institution #1 would not agree to fund the loan unless the taxes were paid off.

67. On or about April 25, 2008, **CHAD GRIFFIN** emailed an employee of Lending Institution #1, copying **KERRI AGEE**, **MATTHEW SMITH**, and one other individual who worked for Lending Institution #1, and asked him what the "accrued liabilities" line item in the Lending Institution #1 write-up of the Borrower #5 loan referred to. That employee responded that they refer to past-due payroll taxes. Then **KERRI AGEE** responded to the group and said that the write-up "can not show we are paying past due taxes" on the Borrower #5 SBA loan. **KERRI AGEE** continued to say that "[t]hese would have to be categorized as working capital and we would have to justify what the working capital would be used for. Again, we would not be

able to state back taxes." The Lending Institution #1 employee responded that this is why he took it out of the project summary. **KERRI AGEE** then asked if the payroll taxes were mentioned in the "use of proceeds" section, but the employee responded that "[i]t mentions paying accrued liabilities, but I can change that to Excess Cash Available if needed."

68. On or about May 8, 2008, **CHAD GRIFFIN** emailed an employee of Lending Institution #1, copying **KERRI AGEE, MATTHEW SMITH** and one other individual who worked for Lending Institution #1, and said that they "are going to need the use of proceeds in the write-up to say that the funds that will be used to pay the Accrued Liabilities (Payroll Taxes) are for working capital. The SBA will not let us pay back taxes with loan proceeds. I understand it is not referenced in the write-up however SBA will trace this back to tax returns."

69. In or about May 2008, **CHAD GRIFFIN** prepared application for a $1,200,000 SBA 7(a) loan on behalf of Lending Institution #1 and Borrower #5 and uploaded them to a file share website for the SBA to later download. According to the applications prepared by **CHAD GRIFFIN**, Borrower #5 would receive $809,757 for working capital. On the guarantee eligibility questionnaire filled out by **CHAD GRIFFIN** and signed by **MATTHEW SMITH**, which had to accompany the loan application, they intentionally did not check the box indicating that loan funds would be used "to repay delinquent IRS withholding taxes."

70. On or about June 13, 2008, the SBA authorized its guarantee of the loan, with $191,105 designated to "pay trade or accounts payable" and $618,652 for "working capital." At the time, **CHAD GRIFFIN**, **MATTHEW SMITH**, and **KERRI AGEE** knew and intended that approximately $770,000 of those funds would be used by Borrower #5 to pay past-due payroll taxes.

71. The sum total of the accounts payable and working capital listed on the SBA settlement statement, which **CHAD GRIFFIN** had prepared and a copy of which **MATTHEW SMITH** had signed at closing, was $770,363.50, the approximate amount going to pay the past-due taxes. The settlement statement was false. On or about June 20, 2008, the date the SBA loan closed, Borrower #5 paid the IRS for an unpaid tax liability in the amount of $770,342.31. **CHAD GRIFFIN, MATTHEW SMITH**, and **KERRI AGEE** knew that the SBA would rely on the false settlement statement in the event the loan defaulted and a purchase request was submitted to the SBA.

72. On or about February 22, 2013, after Borrower #5 had defaulted on their SBA-guaranteed loan, Banc-Serv Employee #1 electronically uploaded to a file share website a purchase request package—for download by the SBA—for the loan that Lending Institution #1 had made to Borrower #5. The package included the false settlement statement that had been prepared by **CHAD GRIFFIN** as well as the loan authorization.

73. When the SBA was deciding whether to honor the guarantee, it scrutinized whether the actual use of proceeds matched the loan authorization. On or about April 18, 2014, Paul Kibiger used the false settlement statement prepared by **CHAD GRIFFIN** to support the position that the majority of the loan's proceeds had been used for working capital in accord with the loan authorization when this was not in fact true. The SBA did purchase the outstanding balance on the Borrower #5 loan.

***Loan to Borrower #6***

74. As set forth below, **KERRI AGEE, KELLY ISLEY**, and **NICOLE SMITH** originated an SBA-guaranteed loan in which they falsely designated loan proceeds as working

capital to conceal the impermissible payment of delinquent taxes and misrepresented that the loan had not been previously submitted to the SBA.

75. On about March 19, 2009, Loan Officer #2 from Lending Institution #3 brought to **KELLY ISLEY** a proposed $35,000 loan that was to be made to Borrower #6, for which they were seeking an SBA guarantee. In the original lender write-up, Loan Officer #2 stated that purpose of the loan was to "provide working capital to pay past due payroll taxes." At the time, **KELLY ISLEY** knew that SBA loan proceeds could not be used to pay past-due payroll taxes. For example, in an email dated July 29, 2008, **KELLY ISLEY**, copying **KERRI AGEE** and **NICOLE SMITH**, had written regarding a different loan, "[P]ayroll taxes are not allowed to be paid out of the working capital proceeds." Nevertheless, **KELLY ISLEY** proposed hiding from the SBA that loan proceeds from Borrower #6's loan would be used to pay past-due payroll taxes. In a March 19, 2009 email responding to Loan Officer #2, **KELLY ISLEY**, while copying **KERRI AGEE**, wrote regarding the payroll taxes, "We will just state working capital since this better fits – is that OK?" Loan Officer #2 replied, "Yes it is."

76. On or about around April 3, 2009, **NICOLE SMITH**, at **KERRI AGEE** and **KELLY ISLEY**'s direction, prepared a SBA 7(a) loan application on behalf of Borrower #6 and Lending Institution #3. **NICOLE SMITH** caused the revised lender write-up to omit any mention of delinquent payroll taxes so that the SBA would not know that the working capital proceeds would be used for an impermissible purpose. **NICOLE SMITH** also intentionally did not check the box on the eligibility questionnaire indicating that loan proceeds were going to be used to pay past-due taxes, which would have made the loan ineligible. On or about April 21,

2009, **NICOLE SMITH** uploaded the loan application, along with the lender write-up and eligibility questionnaire, to a file share site for later download by the SBA.

77. On or about May 5, 2009, SBA faxed a letter to Lending Institution #3 and **NICOLE SMITH** denying the Borrower #6 loan because the owner of Borrower #6 had poor credit history. In its letter, SBA said that "SBA relies heavily on an applicant's credit history to give an indication of future performance."

78. On or about May 7, 2009, **KELLY ISLEY** emailed **NICOLE SMITH**, copying **KERRI AGEE**, and told them that she was going to contact the SBA to see if she could get the loan through, and if not, "then we will withdraw and take express."

79. On or about May 12, 2009, **KELLY ISLEY** emailed Loan Officer #2, copying **KERRI AGEE** and **NICOLE SMITH**, and said that she thought "we should go ahead and take Express because I can't get anyone to return my calls on this."

80. Following this series of emails, **NICOLE SMITH** prepared the same loan to be submitted via SBA Express. On the SBA Express eligibility questionnaire that had to be filled out and maintained in the loan file, **NICOLE SMITH** intentionally did not check the box indicating that the application had previously been submitted under another SBA program. **NICOLE SMITH** had Loan Officer #2 sign the questionnaire at the loan's closing, which occurred on or about May 20, 2009.

81. On or about January 24, 2013, after Borrower #6 had defaulted on their SBA-guaranteed loan, Banc-Serv Employee #1 electronically uploaded to a file share website a purchase request package—for download by the SBA—for the loan that Lending Institution #3 had made to Borrower #6. The package included the false settlement statement and false eligibility

questionnaire that had been prepared by **NICOLE SMITH** and signed by Loan Officer #2 at closing, as well as the loan authorization. The SBA did purchase the outstanding balance on the Borrower #6 loan.

82. As part of the liquidation process for the $35,000 loan to Borrower #6, Banc-Serv worked to liquidate two other SBA guaranteed loans made by Lending Institution #3 that Borrower #6 had defaulted on. On or about January 24, 2013, Banc-Serv Employee #1 emailed **KELLY ISLEY** and told her that in the origination process of one of these other loans to Borrower #6, Banc-Serv had not included the required environmental assessment, and that they could find no evidence that such an assessment had ever been completed. Banc-Serv Employee #1 said that if they did not include one in the process of requesting the SBA purchase the outstanding balance, the loan would likely be charged a repair by the SBA. Banc-Serv Employee #1 asked **KELLY ISLEY** if they should just have someone at Lending Institution #3 create one now, adding that "[i]n the past they have been hesitant to complete anything backdated." **KELLY ISLEY** responded, "[y]es I would request them to sign it. If there was nothing they saw at the time and nothing in [Iowa Department of Environmental Protection] records from then, then it would be reasonable they did not know there was problems." On or about March 7, 2013, Banc-Serv Employee #1 emailed **KELLY ISLEY** and **KERRI AGEE** and confirmed that the signed, backdated environmental assessments were sent to the SBA on or about January 31, 2013.

***Loan to Borrower #7***

83. As set forth below, **KERRI AGEE** originated an SBA-guaranteed loan in which she falsely designated loan proceeds as working capital to conceal the refinancing of ineligible personal debt.

84. On or about March 31, 2010, **KERRI AGEE** contacted Kelly Ayers, a loan officer at Lending Institution #2, with a proposal for Lending Institution #2 to make a $350,000 SBA-guaranteed loan to Borrower #7, which was looking to refinance business and personal debt, including student loans.

85. In the original lender write-up, dated April 16, 2010, Kelly Ayers wrote that $240,000 of the loan proceeds would be used to refinance debt. On or about April 16, 2010, **KERRI AGEE** caused a request for a loan authorization under the Patriot Express to be submitted to the SBA through the SBA's E-Tran portal that stated $235,000 would be used to refinance debt and $85,000 would be used for working capital.

86. Between April 16, 2010 and April 21, 2010, **KERRI AGEE** told Kelly Ayers, the loan officer at Lending Institution #2 handling the Borrower #7 loan, they should reclassify $107,909.13 in student debt that was ineligible to be paid from SBA-guaranteed loan funds as working capital so that the SBA would approve the loan.

87. On or about April 21, 2010, **KERRI AGEE** caused a modification to be made to the loan authorization, such that it listed $227,000 as going towards working capital, when in fact, as **KERRI AGEE** knew and intended, over $100,000 of those proceeds would be used to pay off ineligible student debt.

88. On or about April 21, 2010, at the closing of the Borrower #7 loan, Kelly Ayers and a representative of Borrower #7 signed settlement statements falsely indicating that $224,902.15 of the proceeds of the SBA-guaranteed loan for Borrower #7 would be used for "working capital," when in fact $107,909.13 of that amount would actually be used by the owners of Borrower #7 to pay off student debt.

89. On or about April 1, 2014, after Borrower #7 had defaulted on their SBA-guaranteed loan, Paul Kibiger transmitted the false settlement statement that **KERRI AGEE** had prepared and Kelly Ayers had signed in support of a request that the SBA purchase the outstanding balance on the loan that Lending Institution #2 had made to Borrower #7. The SBA did purchase the outstanding balance on the Borrower #7 loan.

**Additional Fraudulent Conduct**

90. The Defendants undertook additional fraudulent conduct in furtherance of the scheme, examples of which are set forth below.

91. On or about July 19, 2007, **KELLY ISLEY**, copying **KERRI AGEE**, emailed an SBA official to ask whether SBA loan proceeds could be used by a borrower to pay the $800,000 that remained of a $2.1 million fine that had been imposed by the Department of Justice. The SBA official responded, "[I]t would be a no-no for one federal agency to guaranty a loan to pay a fine levied by another federal agency." **KELLY ISLEY** forwarded the SBA official's response to **MATTHEW SMITH, CHAD GRIFFIN, KERRI AGEE**, and an employee Lending Institution #1, and said, "so the only way around this is for [Lending Institution #1] to do an interim note and state it is for working capital. We will have to tell SBA what the funds were used for therefore, you can not state anywhere in your note it is for the payment of a government agency fine."

92. In another instance, on or about April 24, 2009, the SBA sent a letter to Banc-Serv and a loan officer at Lending Institution #3, denying a loan application that had been prepared by **NICOLE SMITH**. The SBA denied the application, according to the letter, because, "the request for an additional $62,984 in working capital cannot be approved." The letter from the SBA

further stated: "The additional working capital would appear to provide the applicant with means necessary to pay down or renegotiate and or/ refinance the [bank] debt SBA has previously determined to be ineligible for SBA assistance. As the working capital funds cannot be monitored and the appearance of circumvention of SBA policy appears to exist, we cannot approve the proposed increase in working capital proceeds." After receiving this letter via a service that converts incoming faxes to email attachments, **KERRI AGEE** forwarded it to **NICOLE SMITH**, copying **KELLY ISLEY** and **CHAD GRIFFIN**, and added, "They got us."

**COUNT 1**
**(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)**
**[Title 18, United States Code, Section 1349]**

93. Paragraphs 1 through 92 of this Indictment are incorporated by reference as though set forth fully herein.

94. Beginning no later than November 2004, and continuing until in or around October 2017, in Hamilton County, in the Southern District of Indiana, and elsewhere, the Defendants,

**KERRI AGEE,**
**KELLY ISLEY,**
**NICOLE SMITH,**
**CHAD GRIFFIN,** and
**MATTHEW SMITH,**

did willfully and knowingly combine, conspire, confederate, and agree with employees of Banc-Serv and other persons known and unknown to the Grand Jury, did knowingly, and with intent to defraud, intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice and attempting to do so, to transmit and cause to be transmitted, certain wire communications in interstate commerce, all affecting financial

institutions as defined under 18 U.S.C. § 20 and 18 U.S.C. § 3293(2), in violation of 18 U.S.C. § 1343.

**Purpose of the Conspiracy**

95. Paragraph 28 is incorporated as a description of the purpose of the conspiracy.

**Manner and Means of the Conspiracy**

96. In furtherance of this conspiracy, and to accomplish its object, the methods, manners, and means that were used are described in paragraphs 26 to 92, and incorporated by referenced as though set forth fully herein.

All of which is in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-5**
**(Wire Fraud Affecting a Financial Institution)**
**[Title 18, United States Code, Sections 1343 and 2]**

97. Paragraphs 1 through 92 of this Indictment are incorporated by referenced as though set forth fully herein.

98. Beginning no later than November 2004, and continuing until in or around October 2017, in the Southern District of Indiana and elsewhere, the Defendants herein, together with others known and unknown to the Grand Jury, did knowingly, and with intent to defraud, devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made, all affecting a financial institution as defined under 18 U.S.C. § 20 and 18 U.S.C. § 3293(2).

99. On or about the dates specified as to each count below, the Defendants specified below, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting

to do so, did knowingly transmit and cause to be transmitted certain wire communications in interstate commerce, as more particularly described below:

| Count | Defendant(s) | Date | Wire Description | Financial Institution Affected |
|---|---|---|---|---|
| 2 | **KERRI AGEE, KELLY ISLEY, NICOLE SMITH** | 4/21/09 | Electronic file transfer of application for guarantee of Borrower #6 from Southern District of Indiana to SBA office in California | Financial Institution #3 |
| 3 | **KERRI AGEE** | 09/03/2009 | Electronic file transfer of request to honor SBA guarantee of Borrower #1 loan from Southern District of Indiana to SBA Office in Virginia | Financial Institution #4 |
| 4 | **KERRI AGEE, KELLY ISLEY, NICOLE SMITH** | 1/24/2013 | Electronic file transfer of request to honor SBA guarantee of Borrower #6 loan from Southern District of Indiana to SBA office in California | Financial Institution #3 |
| 5 | **KERRI AGEE, KELLY ISLEY, NICOLE SMITH** | 4/1/2014 | Email containing request to honor SBA guarantee for Borrower #7 sent from Southern District of Indiana to SBA office in California | Financial Institution #2 |

All of which is in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNT 6**
**(Conspiracy to Make False Statements in Purchases and Applications for Guarantees)**
**[Title 18, United States Code, Section 371]**

100. Paragraphs 1 through 92 of this Indictment are incorporated by reference as though set forth fully herein.

101. Beginning no later than November 2004, and continuing until in or around October 2017, in Hamilton County, in the Southern District of Indiana, and elsewhere, the Defendants,

**KERRI AGEE,**
**KELLY ISLEY,**
**NICOLE SMITH,**
**CHAD GRIFFIN,** and
**MATTHEW SMITH,**

knowingly and willfully conspired and agreed with employees of Banc-Serv and other persons known and unknown to the Grand Jury to commit an offense against the United States, namely making false statements, for the purpose of influencing the action of the Small Business Administration in connection with provisions of the Small Business Investment Act of 1958, upon any purchase, purchase agreement, repurchase agreement, and application for a guarantee, in violation of 18 U.S.C. § 1014.

**Purpose of the Conspiracy**

102. Paragraph 28 is incorporated as a description of the purpose of the conspiracy

**Manners and Means of the Conspiracy**

103. In furtherance of this conspiracy, and to accomplish its object, the methods, manners, and means that were used are described in paragraphs 26 to 92, and incorporated by referenced as though set forth fully herein.

**Overt Acts**

In furtherance of the conspiracy and to achieve its object and purpose, at least one of the co-conspirators committed and willfully caused others to commit the following overt acts, among others, within the Southern District of Indiana and elsewhere:

104. On or about April 21, 2009, **KERRI AGEE**, **KELLY ISLEY**, and **NICOLE SMITH**, working on behalf of Lending Institution #3, caused an application and eligibility questionnaire for a guarantee for a loan to Borrower #6, containing misrepresentations about the use of proceeds, to be submitted to an SBA loan-processing center in Citrus Heights, California.

105. On or about April 24, 2009, **KERRI AGEE** wrote, "[t]hey got us" in an email she forwarded to **KELLY ISLEY**, **NICOLE SMITH**, and **CHAD GRIFFIN**, which contained a denial letter from the SBA in which an SBA official explained his suspicions that working capital proceeds would be diverted to pay down debt the SBA had previously deemed ineligible.

106. On or about September 3, 2009, **KERRI AGEE**, working on behalf of Lending Institution #4, caused the settlement statement and loan authorization in the name of Borrower #1, containing misrepresentations about the use of proceeds and the existence of an equity injection, to be transmitted to the SBA in support of a request that the SBA purchase the outstanding balance on the loan to Borrower #1.

107. On or about August 19, 2012, **KERRI AGEE** and **KELLY ISLEY**, working on behalf of Lending Institution #3, caused the settlement statement and loan authorization in the name of Borrower #2, containing misrepresentations about use of proceeds and the size of the borrowing company at the time the authorization had been sought, to be transmitted to the SBA in support of a request that the SBA purchase the outstanding balance on the loan to Borrower #2.

108. On or about January 24, 2013, **KERRI AGEE, KELLY ISLEY**, and **NICOLE SMITH**, working on behalf of Lending Institution #3, caused the loan authorization and eligibility questionnaire in the name of Borrower #6, containing misrepresentations about the fact that the loan had been previously submitted under another SBA loan program, to be transmitted to the SBA in support of a request that the SBA purchase the outstanding balance on the loan to Borrower #6.

109. On or about February 22, 2013, **KERRI AGEE, CHAD GRIFFIN**, and **MATTHEW SMITH** caused the loan authorization and settlement statement in the name of Borrower #5, containing misrepresentations about the use of proceeds, to be transmitted to the SBA in support of a request that the SBA purchase the outstanding balance on the loan to Borrower #5.

110. On or about April 1, 2014, **KERRI AGEE**, working on behalf of Lending Institution #2, caused the loan authorization and settlement statement in the name of Borrower #7, containing misrepresentations about the use of proceeds, to be transmitted to the SBA in support of a request that the SBA purchase the outstanding balance on the loan to Borrower #7.

All in violation of Title 18, United States Code, Section 371.

**<u>COUNTS 7-13</u>**
**(False Statements in Purchases and Applications for Guarantees)**
**[Title 18, United States Code, Sections 1014 and 2]**

111. Paragraphs 1 through 92 and 104 through 110 of this Indictment are incorporated by reference as though set forth fully herein.

112. On or about the dates specified as to each count below, in the Southern District of Indiana and elsewhere, the Defendants specified below, knowingly made, caused to be made, and aided and abetted the making of, false statements, specified as to each count below, for the purpose

of influencing the action of the Small Business Administration in connection with provisions of the Small Business Investment Act of 1958, upon any purchase, purchase agreement, repurchase agreement, and application for a guarantee, as more particularly described below:

| Count | Defendant(s) | Date | Description |
|---|---|---|---|
| 7 | **KERRI AGEE, KELLY ISLEY, NICOLE SMITH** | 4/21/2009 | False statement regarding proposed use of proceeds in application for SBA guarantee for Borrower #6 loan, in that $35,000 of loan proceeds would be used for working capital when in fact, as the defendants then well knew, $20,000 of the $35,000 was to be used to pay delinquent taxes |
| 8 | **KERRI AGEE, KELLY ISLEY, NICOLE SMITH** | 4/21/2009 | False eligibility questionnaire in application for SBA guarantee for Borrower #6 loan, in that the box disclosing that loan proceeds were to be used to pay delinquent taxes was not checked when in fact, as the defendants then well knew, loan proceeds were to be used for that purpose |
| 9 | **KERRI AGEE** | 9/03/2009 | False settlement statement in request for SBA to purchase balance on Borrower #1 loan, in that $65,004.20 was listed as going toward working capital, when in fact, as the defendant then well knew, $50,000 of the $65,004.20 was used to make it appear that an owner of Borrower #1 had made a $50,000 equity injection required by the SBA |
| 10 | **KERRI AGEE** | 9/03/2009 | False certification that lender had complied with SBA program requirements in request for SBA to purchase balance on Borrower #1 loan when in fact, as the defendant then well knew, the borrower had not provided $50,000 equity injection |
| 11 | **KERRI AGEE, KELLY ISLEY, NICOLE SMITH** | 1/24/2013 | False eligibility questionnaire in request for SBA to purchase balance on Borrower #6 loan, in that the box disclosing that the loan had been previously submitted under another SBA program had not been checked when in fact, as the defendants then well knew, the loan had been previously submitted and denied by the SBA under its standard 7(a) processing |

| Count | Defendant(s) | Date | Description |
|---|---|---|---|
| 12 | **KERRI AGEE, CHAD GRIFFIN** | 2/22/2013 | False settlement statement in request for SBA to purchase balance on Borrower #5 loan, in that $191,105 was listed as going toward accounts payable and $579,258.50 as going toward working capital, when in fact, as the defendants then well knew, $770,342.31 of the total amount, $770,363.50, had been used to pay delinquent taxes |
| 13 | **KERRI AGEE, KELLY ISLEY, NICOLE SMITH** | 4/1/2014 | False settlement statement in request for SBA to purchase balance on Borrower #7 loan, in that $107,909.13 was listed as going toward working capital, when in fact, as the defendants then well knew, $107,897.32 of that amount had been used to pay student loans |

In violation of Title 18, United States Code, Sections 1014 and 2.

**FORFEITURE**

113. The allegations contained in paragraphs 1 through 92 and 104 through 110 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(2)(A), as part of any sentence imposed.

114. Pursuant to Title 18, United States Code, Section 982(a)(2)(A), if convicted of the offenses set forth in Counts 1 through 13 of this Indictment, the Defendants,

**KERRI AGEE,**
**KELLY ISLEY,**
**NICOLE SMITH,**
**CHAD GRIFFIN,** and
**MATTHEW SMITH,**

shall forfeit to United States of America:

a. any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offenses; or

b. a sum of money equal to the total amount of the proceeds of the offenses.

115. If any of the property described above, as a result of any act or omission of the Defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL:

[redacted]
FOREPERSON

JOSH J. MINKLER
United States Attorney
Southern District of Indiana

ROBERT ZINK
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice

By: [signature]
William Johnston
Vasanth Sridharan
Trial Attorneys, Fraud Section
Criminal Division, U.S. Department of Justice